We will utilize the same usual time frame of 15 minutes. Would you like to divide the time? Would you like to reserve your time for your rebuttal? Yes. How much? Fifteen. Please hold for a second. R-A-N-J-R-A. Ladies and gentlemen, please keep your voices loud. The speaker is loud, and that's not a microphone. It's not. Please let me know if I'm talking too softly. I've been told I do that. You're talking too softly. Thank you. First, let me get it out of the way. Identify yourself. Hello, everyone. My name is Alicia. I represent the appellant, Brian A. Let me get this out of the way. I've been an attorney for 40 years, and I've been doing appellate work for a long time. I still hate oral arguments.  Now, this case involves children who came into the system because the mother called the police during a point where she was having a psychiatric event and accused a neighbor of watching pornography. The police came and were concerned about her erratic behavior and also the bizarre behavior of my client, Brian A. There was no indication that the children were harmed or in any way neglected or abused. The juvenile court act section- But her mother was pregnant at that time. No, not at that time. She had a child at that time. She has a child after the case of VR is screened in. She may be pregnant at that time, but she has Jace, our leader. She was born six or eight months later, I believe. Did you say six? I think so. So, you said the mom called the police? The mom called the police regarding a neighbor. The police were concerned about the behavior of the parent and called DCFS. But as I said, there was no sign that the children were neglected or abused. The child. The child. They had a child. VR. The purpose of the juvenile- Do you have a plan that found all of the marijuana plants? Yeah, they did find marijuana plants at that time. I would point out that the state of Illinois has determined that the use of marijuana is not going to be a criminal offense anymore. So, and there is case law that indicates even if you may be using, you still have to show that it interferes with the ability of the parent. There was no evidence that they were actually using, just that there were plants and paraphernalia there. The purpose of that very moment, because the parents later both admitted that they used marijuana. Right. And there were concerns because of their mental health issues and the use of the marijuana. And we can- That's a private issue. Yes. That those two interactions did- There's no evidence that there was any interaction between the marijuana and the use that caused any abuse or neglect. I have to say you're spending a lot of time on the beginning of the case, and the case has gone on for five years, so you need to jump to the real meat of this now. Okay. All right. The purpose of the act is to reunify families. That's in section 405.1-2. In this case, the father completed all of the services. He successfully completed parenting. His psychiatrist informed the court that he no longer needed to be on medication and he no longer needed to see a psychiatrist. His parent coach indicated that he was an excellent parent, that when he needed to redirect or discipline the children, he got down on their level, looked them in the eye, and talked calmly to them about what their behavior was and what needed to be redirected. He still needed to do therapy, though. Psychiatrist said he consistently did his individual therapy. We just have our therapy. He consistently went. He consistently attended therapy. Very consistently. He did everything. In fact, the court found that he had substantially done all of his services. The service plan finds that he has reasonably made progress in all services. And I can give you that site. The father, Mr. A, has been engaging in services since May 2014. He completed a requested substance abuse assessment at Lutheran Social Services. He also continues to engage in mental health therapy at Turning Point in Skokie, Illinois. In May of 2015, his former psychiatrist found him stable enough not to be on psychotropic medication, and that he no longer needed the services of a psychiatrist. He used to do red and green drugs. His substance abuse assessment did find he needed any treatment at all. The DCFS service plan, December 7, 2016, at E2712 indicates, I'm sorry, at 2769, indicates Mr. A has satisfactorily completed the parent coaching classes at Bentley Focus. Can we talk about the parent coaching? Yes, you can rely on it right now. I will. It's on page 21 of my brain. Let me ask you this question. Sure. How many parent coaching sessions did the father have? I can't tell you that. Not very many. What was required by DCFS? Well, didn't even the father say that he really sort of minimized the parent coaching? I mean, how can a few sessions that I have show whether or not I was a good parent? No, I don't believe that that was necessarily what he said, and I think the better evidence is the coach herself, who stated that Mr. A was consistent in attending all of the sessions and visits of fathers. He was absurdly prepared with age-appropriate toys and activities for visits with his children. Ms. Mendoza stated that she had not observed Mr. A twice or caused harm to the children during these visits. He was noted to be very vulnerable towards his children's needs as well as an advocate for his children. The children had been seen playing with and having fun with their father. Why do you think that a mother is a threat to the children? Why do you think that a mother is not a threat to the children? There was testimony by her therapist, General Irma, that indicated that beginning in 2017, a mother was arrested for resisting arrest and hitting a police officer. She went to jail. This is the mother who was college educated. She has a Ph.D. She was a professor. This is not drug abuse. This is something she had no control over. In 2017, she hit bottom. She went to jail and she hit bottom. She realized that she needed to be in treatment, and when she got out of jail, she attended therapy. By the time of the termination hearing, Mr. A had testified and her quarantine capacity assessment indicated she had been in remission for a lot of months. She had been consistent in therapy. She was consistent in taking her medications, and the quarantine capacity assessment found that in 2017, she was no longer a danger to her children, and that she could satisfactory and adequately parent. What parent capacity? It's with 14, I believe. People can do this for 14. Oh, I'm sorry. Are you talking about the J-C-C-E, done later? I think that's a little different. Is there an issue that the mother has chosen not to proceed on her appeal from her termination? I did not hurt her, and I can't tell you why. I would think that because Mother was not in services for at least two of the nine-month periods after disposition, that they felt that under Subsection M of the Adoption Act, the court could find her unfit. Opposition is the only reason that the court found the father unfit, which he applied Mother's nine-month period of noncompliance to the father. There's something in the statute that says that you apply that to the father. Yes, there is case law that says when a parent stays with a sexually abusing spouse and continues to say he didn't do it, that those nine-month periods apply to the spouse who did all the services. But again, this is a different case. This is a mental illness. What evidence is there that the mother did anything to the children? No, there is none. She does have the problem with the police, and she had a problem with Ms. Bolden, the social worker. Right. But what did she do to the children? Nothing. I mean, she's always been an adequate parent. There was no evidence that these kids were- She did threaten to kidnap the children. She did threaten to kidnap the children. Yes. Is that harm? I mean, she didn't find them. She was upset that DCFS had them, and in her mind, there was no reason. Again, I'm not her attorney, and I'm not saying that she didn't have problems, but the law says that even if the court could apply, I do want to point out that the only reason the court terminated the advance right is because the court found that the father maintained a relationship with the mother. This is why I'm asking you these questions. That's the only reason. I want to point out that the agency continued to ask the father during the integrity in this case to encourage the mother's business services. There's a case law that indicates you can't- DCFS can't tell a parent to do something and then hold it against them on doctor's termination. Okay. So they continued to say, and in fact the service plan indicates, the reason they're asking for a ball is the service plan in December 10, 2017, is that Mr. A has made reasonable progress towards reunification, but he lives and remains in a committed relationship with the mother and his children. That's the only reason. Well, the mother showed there's many examples of her aggressive behavior. Absolutely. Until she kicked on him and got him to services, even if you hold the fact that he had a relationship with her. I'm telling you that the agency encouraged that relationship because they thought he was a good support to the mother and could get her into services. In fact, the first parenting assessment also encouraged him to influence the mother. It was delivered in a message that as long as the children are exposed to the mother and she is untreated, she poses a danger to the children. And that if he wanted to gain reunification, the mother needed to get it to him. Exactly. Which is what he did. He moved out. He had his own apartment. He had unsupervised visits to the apartment. That was three years after the children were taken away. 2017. While the children were... 2014. And he never gained overnight. Yes. He never gained overnight because he allowed the mother to spike in so that the kids who wanted to see their mother, and she wanted to see them, could see their children, her children. I think it was totally irresponsible and punitive of the agency to deny the mother to even see her child to spike in. Well, they offered her once the supervised visitations were ended because she really was out of control at that point. Once the time had passed, they offered her to restart the visitations, and she declined. But that doesn't go to any danger of allowing his wife or husband to actually see his children and to see them. Don't you think that looks like she was trying to go around the controlled place? I don't represent the mother. I represent the father. And I don't think that's relevant. I think the fact is that a parent has the right to see their children. I don't know why her attorneys didn't go into court and demand those visits or at least spike in. Well, she eventually got to it. I only have 10 minutes. Okay, you're really past 10 minutes. So, wait up. Please, if somebody asks a question, please answer. We're not stopping you from your time. I feel like down to the best interest hearing, even if you find that the court had grounds to hold father not making any progress, even though he did all the services and was a great father, because he had a relationship. The best interest hearing allows the court to go outside those nine-month periods and to look at the behavior after those periods to determine the best interest of the children. Again, we're looking for permanency. The general act indicates that the primary goal is reunification. By the time of the best interest hearing, mother was in remission for a lot of months. She's totally compliant with her services. She had a parenting capacity done in 2018 that indicates that she can parent. It also indicated that they thought she was in compliance because she was on probation. And I would argue that. But, again, you're saying that it's not valid and then you're telling me it is. No, but then what is the basis for saying that she was in compliance because she was on probation? Is there any evidence? There's evidence that she was in therapy. The therapists testified that she had been totally compliant with therapy. Listen to my question. What evidence is there that the only reason the mother was in compliance was because she was on probation? There was no evidence that that was the only reason. You know, that's like saying, you know, when did you start being your wife? My argument is that she had to reach that bottom, which she did when she went into jail, and she personally realized that she needed that. And I think her therapist testifies to that, that it was a personal decision that she made that she needed to manage her mental health. And we've had so many clients who are on probation and don't adhere to the conditions of probation. A lot of them must have had a long time to do it just because of that.  And her therapist testified that she was motivated. She was motivated to get her kids back, and her therapist testified to that. So at the best interest hearing, if we're looking for permanency, we have two parents. So counsel, why is it that you disagree that the father was not unfit? The evidence shows that even though he remained delusional, he had that behavior under control. The case law says no one below is not grounds for finding unfitness. You have to show that the unfitness affects his ability to parent. It didn't in most cases. Parent coaching indicated that in her reports. He's a good father. He has issues. But even in his parenting assessment, he says, I know I have these, but I don't share those with my kids. I don't base my parenting on how I feel about my religion. But when he testified in the best interest hearing, that was the primary. He never spoke about why it would be in the best interest of the children to be with him. He spoke about his religious beliefs. I held that against the child attorney for not questioning. I think you're going to put a person on the stand, you should be asking that person direct questions so that he could respond to them instead of throwing them off on the narrow end. So those questions weren't really asked of him. And I think you have to look at his actions and the reports. The report says this man can parent, that Victor especially has a very close relationship with him, that the court only found the only ground for unfitness with his relationship with another. Okay? So if we indicate, if the court indicates that that's not true, I would argue it's not when the parents have said everything and the agency has encouraged that relationship, that that's not grounds for unfitness. But even as it is, at the best interest hearing, we are faced with two parents who are in compliance. A mother who had severe mental illness issues and is in total remission for 11 months and has a parenting situation. The focus at that stage, the best interest on the father. And why would it be in the best interest of the children? With permanency as the goal. They've been outside. They've been in foster care for over four years. They have a situation of a foster parent who got the older son from medical treatment that he needed, which was the diagnosis that was made before he came to them. They are happy. They are thriving in school. And there was nothing on either side presented as to the father, right? This was in the best interest. Well, there was evidence that when that child was hospitalized, he was at the child's bedside every day. You don't see that very much in juvenile court reviews. The foster parent was the father in continuing contact and participation with the children. Was he? Yes. He had visits every week. Throughout that four years, he missed one visit, which the agency made a big deal out of to show that he still had a relationship with the mother because he went to the mother's court date. That's the only visit. And at that court date, he was there again as a support. The testimony was he didn't even talk to the mother. Okay? He was just there to see what the court was going to do to his mother and his children. Okay? Every other visit he attended, so he's been a consistent presence in his children's life. They know him. They love him. They look forward to those visits. Again, when they were living with the parents, there was no sign that they were abused or narcissistic, no indications that the parents couldn't take the children to school. Victor was acting out based on what the play therapist indicated. It was the aggressive behavior he may have witnessed with the parents. So there is injurious environment-type indications here, at least. Possibly the children act out, especially the little boys. I've raised one. Yeah? And he continued to exhibit that 30 years after he was doing his foster home. Can you hear me? You need to wrap up. Okay. As that indicates, the father did everything he was asked of, and the evidence shows the only reasons his rights were terminated was because he maintained a relationship with the mother, a relationship these kids have to encourage. They can't have it both ways. And if we get to best interest, the goal is permanency. These children can live safely with their parents. The parenting capacity for the mother indicates that the parent coaching before the mother was terminated. They can't live with the mother because her rights are terminated. Well, I mean, to live with the father, even if the rights are terminated, it doesn't mean that, you know, she couldn't be in their preference or, you know, be part of their class. In fact, a question that's asked at every termination of a foster parent is, are we going to allow the parents to continue to visit? So even at termination, the court is looking at, are you going to let the children maintain a relationship with the parents? Okay? And, in fact, we've had cases where the kids are older, and they're never adopted, and the courts finally allow them to reunify with their children. Well, didn't the foster parents say that they were willing to allow a continuation of visitation and relationship with the father? The parents probably said yes once they felt that there wasn't a safety concern. I'm not sure whether it was a safety concern regarding the mother. Okay. Thank you. Thank you. May it please the Court. Christopher Williams, Assistant Public Guardian, name of the present counsel and friend. Good morning. I'm Assistant Public Guardian Christopher Williams, and I represent Victor, who's age seven, and Justin, who's age five. I would like to start out by clarifying the nine-month time periods in which the father should be found or should be the nine-month time period that should be reviewed for unfitness. My brief was slightly confusing. I apologize for that. The trial court found the father unfit under the same time periods as the mother. But in our brief, we really focused on the first three nine-month time periods, and I think it's important to clarify what those are. The adjudication hearing was on April 6, 2015, so number one is April 6, 2015 to January 2016, and number two would be January 6, 2016 to October 6, 2016. Number three would be October 6, 2016 to July 6, 2017. So I apologize for any confusion in my brief. We're certainly asking that this court affirm the trial court's report. In the case of Inmate SKD, this court is a very similar case to this, as a matter of fact, and it's cited in my brief. The court made a special note and focused on the fact that the trial judge in that case had presided over the case for five years and had reviewed thousands of pages of evaluations. The same is true in this case. This case was presided over by the same judge for four or four-and-a-half years. We already know that special deference is given to trial courts in child protection cases. We know that this judge was sympathetic to these parents. And, by the way, no matter what I say today, I don't want anything I say to be construed as harsh against the parents. I understand that these parents are dealing with a mental illness, and we have the public guardian that has sympathy and compassion for them. However, what you and what the court is saying is that in order for the father to be with his children, to not be terminated, he has to basically terminate his relationship with his significant other of more than ten years and the mother of his child. How is that justice? Well, Your Honor, first of all, I think the idea was that he didn't have to terminate his relationship, but he could not co-parent with that. So the question of how is that justice is that the First District has issued three opinions that I have cited in my brief that explain how it is justice. And the idea is that when two parents are co-parenting together, both of them have to be safe, have to be able to safely parent. And we do already know that the mother in this case, this court granted her counsel's and his motion on August 9th. She is unfit. But how is she unfaithful to you? Well, Your Honor, I'd like to directly address that. I prepared for this question. And I know your mother asked my friend and opposing counsel what harm the mother did to the children. I want to address that directly. So starting in the time periods, okay, first of all, we know that the mother had a serious mental illness and had psychosis and serious delusions. That by itself, okay, we need more. How is the mother a harm? So April 2015, she had an incident at a visit where she followed the caseworker out. She had a meltdown at the visit, followed out. She had to kidnap the children. She kicked the car. The children witnessed her aggressive behavior. Victor saw it. He was crying, but he became so much in shock that he stopped crying, and he was in shock. Okay? You should not interrupt. That is directly in the record, Your Honor. June of 2015, she became physically aggressive towards the caseworker, tried to hit the worker. The father had to intervene physically and stop her. The children were present. According to my knowledge of the record, the children were present in June of 2015. Brian remained with the children. In June of 2015, the mother went to the office, threatened to kill an employee, and kicked two holes in the wall. I don't believe the children were present at that point. So the mother did have some incidents where she had... Where has the mother been to the children? Has she ever done anything to the children? She has never physically harmed the children, Your Honor, and that's absolutely... It's not a necessary fact. It's not a necessary condition. But it's not a fact that she has physically harmed the children. She has not physically harmed the children. Thank you. However, she is unfit, and her rights are terminated, and that... I don't think I can technically say that's the law of the case. I'm not really sure, because the case has been unconsolidated. But it's very close to being the law of the case. So really, the question is the father. Under these three time periods, was the father unfit? Under NREA-HS, NREA-SKB, NREA-SS, according to those precedents, was he seeing how much she was a danger to the children? Was he minimizing her danger? Was he committed to disengaging from co-parenting? And the answer to all of those questions is no. I'd like the court to focus... The question is, was the father... Did he minimize the danger? Was he a danger? Did he minimize the danger to the children? The danger being the mother kicking and punching holes in walls and threatening the social worker. In front of the children. And did he minimize those dangers? And putting the children in shock. Yes. In what? Shock. Shock, Your Honor. Victor was in shock. In shock. Victor was in shock. Correct. Because he witnessed his mother having a... He said Victor was in shock. In case worker. The same case worker was threatened. I believe it was Miss Fulton. The one who she threatened said that the child was in shock. Correct. She would... I don't... She would have no reason to... I just wanted to make sure it was the same person. So... Brian was interviewed by Dr. Agarwal at the CCJCC. A very thorough evaluation. That report came out in October of 2016. That would be in between the second and third nine-month time period in which Brian is unfit. Here's what Brian said. These people have lost their mind. We haven't done anything wrong. These people have lost their mind. We haven't done anything wrong. That applied to the beginning of the case. That applied to having a marijuana growing operation in their basement. Let's be real. 53 plants is not for personal use. He had skills. Nobody can smoke that much marijuana. Brian never understood the danger that that posed to the children. Criminals ready to grow operations at gunpoint. I don't mean to create some kind of threat. Ready to grow criminal operations at gunpoint? Was that evidence in this case? No, no. It's something that you just made up in front of this court. It's an argument. Speculator. I'm a speculator. Please don't. Don't worry. I think the evidence shows it was a growing operation because there was scale. So that's what the evidence shows. I apologize if I went too far in speculating that growing operations get wrong. I appreciate it. These people have lost their mind. We haven't done anything wrong. And that's what the father believed throughout the entire case. He never really changed his mind. He got an apartment at one point. His clothes were not there. His car was seen in front of his own home. Now, let's put aside the issue that the father went to court to the mother's court hearing. That's fine. That's a red herring. It's not really an issue. What we do know is that we have telephone calls between the father and the mother. And those disks with the audio files actually have arrived at the court, I believe, on Friday. The clerk of the child protection court did not send those over with the original record, but they are with the court now. It's a huge amount of audio file. I don't know if the court's been listening to all of it. It was happening when the mother was incarcerated. The calls were recorded. It is obvious that they are still a couple, and they are still together, and they're still committed to co-parenting their children. And, in fact, the mother's own therapist said that both of them would like to co-parent their children together. So, under established case law, first district precedence, NRAHS, which the child court specifically noted and specifically relied on, and NRAHSKB and NRAHSS, I don't see how this court can reverse this case without overruling all those cases and creating a new rule of law. I don't see how it can do that. I could be wrong. And I'd like to address something my co-counsel or, I'm sorry, opposing counsel stated as well. Well, that's a case that involves sexual abuse. Well, no, it involves more than that. It involves a father who stayed with a mother who had drug use and mental illness. And we have both of those in this case. The mother has a long history of using marijuana, which indeed may not be as serious as other harder drugs. What about the opposing counsel's argument that the mother was in full remission for 11 months? Well, I would argue that that has no relevance to unfitness. It may have relevance to the very last nine-month time period that the child court referenced, which would go up to April 8th of 2018. I admit that. But we have three nine-month time periods where the mother was not in remission. She was not. And in terms of the question of how she got into remission, I'm not willing to say that it was only because of incarceration and being on probation. We don't know. She may be genuinely focused on her mental health and taking her medication. But it's true that she did not begin to take her medication until she was incarcerated and forced to. But the truth is we don't know. So I'm not going to go on a stretch and claim that she was coerced. I'm not going to say it's likely that she will go back on her, you know, stop taking her medication. The main point is that we have three nine-month time periods in which she was in clear danger, clearly psychotic, sadly. In the most recent nine months, she was not. That would be correct. She was in remission. She was taking her medication. Yes. But this court only needs an evaluation focused on the first three nine-month time periods and it only needs one nine-month time period. I mean, this was a case where all parties gave both parents a chance, many chances. The trial judge waited to change the goal, gave the parents chance after chance. The state waited to file its termination petition, gave the parents a chance to get themselves to make the progress that they needed to. This is not a harsh punitive process here. This was a case where the system worked how it was supposed to, meaning that they didn't rush to terminate criminal rights on these parents. They waited and waited and tried to give them a chance. And finally, the mother was incarcerated. And by the way, I have to mention that the mother had previously been arrested on a bus for biting a woman in front of her own children because she believed the children had been abducted. What year? I'm sorry, what year? I believe that that would have been in 2016, Your Honor. The bus incident, the bus, oh, I believe it was July 27, 2016. She accused a woman of abducting her own children and got an altercation and bit her on the hand. So we know that the mother is capable of attacking other people, physically biting them. Again, she did not harm the children, that is true. And the children were not present. Her children were not present. The children at issue in this case were not present. They were not. They were not. They were present during the mom's other incidents where she tried to do damage to the vehicle and Victor was in shock. They were also present when she called the police during a visitation, correct? There was another incident, yes, where the children were present. And I would point out that the presence of the children during these incidents, yes, is obviously relevant. It's not determinative. A parent can be clearly dangerous and exhibit dangerous behavior even when the children aren't present. And I would just keep reminding this court that the mother's annual motion was granted by this court. Okay. So. The 11-month period that we're talking about. No, the 11-month period. No, the 11 months that the mother was in compliance. I'm sorry. Did that include the time when she was in jail? Well, when she got into jail, she began taking her medication. And I think, I mean, the record does not have a minute-by-minute timeline or day-by-day timeline. At some point after incarceration, her medicine started to take effect. I believe she was arrested in March of 2017. So that's about when she started to become, and, you know, the third nine-month time period technically goes from October 6, 2016, to July 6, 2017. So she began taking her medication sometime within that third nine-month time period. It got better. But we have the two nine-month time periods, and this case is about the father. This case is about the father. The mother decided not to seek reversal. And this court granted that motion. So a few things I'd like to point out, arguments that my present counsel made that I feel important to point out. It was said that the father was given mixed messages about what he needed to do. The record does not reflect that. The record is clear that the caseworker testified. The caseworker testified that she told the father over and over and over, every time she saw him, you cannot have your children return home to you unless the mother complies with the medication and becomes better, makes progress. Okay? And what the caseworker and other parties kept saying was, you can help her do that. You can help her get better if you support her. Okay? Makes complete sense. But they said clearly, and you can see it from the history of the case in the permanency orders, that the father knew. The father knew all along if the mom does not make progress. And I'm talking, we're talking about three nine-month time periods here in which she didn't. If the mom did not make progress, I have to get the medication. Has the opposing counsel said that DCFS caseworker encouraged the father to support the mother? Yes. To help her get better. Yes. Which makes complete sense. But the DCFS caseworker also was crystal clear that if the mother does not get better, you cannot co-parent with her. There was never any confusion. There was never any ambiguity about that message. Ever. The father knew. The father knew. The people lost their minds. We haven't done anything wrong. That's where the father was in October, or just briefly prior to October of 2016. This is Dr. Agrawal's report. It's important to note, too, that Dr. Agrawal, and this court can confirm on any basis on the record, Dr. Agrawal noted that the father himself, even irrespective of the mother, had his own problems, and his ability to parent the children was low to moderate, as she said. And there's something very interesting in that, in this report, which is that we know that the father tested negative for marijuana on a few occasions. So in that sense, we have to acknowledge that. On the other hand, in that report, the father said clearly, I like to smoke every day. I like to take a couple puffs off a joint every day. And when you're dealing with people with mental illness, that kind of marijuana use has a serious weight. I understand, as her counsel said, marijuana will be legal, yes. But in this case, it's something to be noted. There's a contradiction there. I wanted to point out Brian's statements that he made. So what year was that, then? Well, his interviews for that report were in August, September, and October of 2016. So I don't know which particular month. He made that statement, but he made that statement. She also found that his, she talked about his delusional disorder and how he could function normally or appear to be normal, but there were things that could trigger it, and they were unknown triggers. That's correct. That's another aspect of why she believes he had a low to moderate ability to parent on his own. That's a very good point. She made the very important point that it's unclear how effectively and safely and how he could parent as the children got older and he had to interact with other professionals. What would it trigger? I'm sorry? What would it trigger? It might trigger delusions. It would trigger his delusions. Okay. Yeah, but is delusions a threat to the children? Not a direct physical threat. Not during this time. But, again, unfitness does not hinge on direct physical threats. Of course, it's relative, obviously. And it has to be acknowledged. And it has to be acknowledged that this father, when he interacted with his children, he did it very appropriately. I mean, he, during visits, he was fine. But let's be real about this. He was, he knew that the mother was not supposed to have contact with the children. And we're not talking about just Skyping. Victor said, when you go back to the foster home and say, I, about 75% of the time.  Correct. Correct, Your Honor. The father continually violated court orders in this case. And that goes to the ground being unfitness finding, which would be, by the way, would be a responsibility. I think there's three unfitness grounds, interest and concern, if you put that aside. He showed interest. His responsibility, I think, on unfitness finding is very much supported by the manifest weight of the evidence. But certainly the ground unfitness finding is. Certainly the ground unfitness finding is. These people have lost their mind. We didn't do anything wrong. Fifty-three marijuana plants in his basement. You know, NASA mentioned his complete immunization and denial of the mother's very unfortunate mental illness. What did he testify to at the best interest hearing? I can't remember what he testified in the determination hearing. I thought there was some bizarre stuff I read. I just can't. Well, thank you, Your Honor. I was going to turn to best interests. His testimony at the best interest hearing was, as I opened up with, I absolutely do not intend to sound harsh and demonize a person with mental illness. It was tangential. It was illogical. But more importantly, it was very clear that he still did not understand why the entire case was here. I have a section here in my binder that has his testimony. I mentioned that he said, showing up to work every day, doing the same thing he did yesterday, brought us the millions of genes that were mastered by those workers. Now, he says, my children have been taken away from my family, the family that has never shown any signs of abuse, any reports of disorderly in the family. Any reports. We've never done anything. He talked about the officer who came to his home, who walks with the kingdom of an Indian head, of the people who have been murdered. He's referring to the Spokane police who have a Native American signified. The lies that have been yielded by this court, he says, because I see you guys as the hires out in my father's garden. I am the one that's mentioned. I'm the last Adam. That's what I told the officers. I was growing trees. I was growing trees. The 53 marijuana plants. The caseworker, this woman is a disgrace. What she's done to society, it's an incredible waste. Again, there was nothing indicating we were doing anything wrong, other than trying to get to the doctor without being hindered. He said, I was fine at home. I was fine at home. Growing a little weak, and I know the scriptures is true. He claims he called the police to report himself for growing trees in the basement. Quite frankly, it's unclear whether the mother or he called the police on himself. He was growing trees in the basement. What's worse? His testimony at the best interest hearing, he is still clearly delusional, and we're talking about best interest here, not on fitness. What kind of trial judge, what is a trial judge supposed to do in hearing this testimony? It's not the counsel's fault. I mean, he's going to say what he's going to say. He's going to believe what he wants to believe, and it is what it is. He is unfortunately still incredibly delusional, and most importantly, still not believing that he or the mother did anything wrong. We have a case where the foster parents are clearly committed to maintaining a relationship with the father, and if appropriate, the mother, once they adopt these children. And that's authentic, because the foster parents were impressed by the fact that he visited, I believe it was Victor, in the hospital when he had a surgery on his back. And not only that, Victor's therapist testified that the foster parents have said to her, we believe that Victor has a good bond with his father, and we are going to maintain that. That shows foster parents, who are not out for themselves, that they are focusing on what is good for the children. So they're going to maintain that bond. But the trial court understood that it had to follow the law. It had to follow the Illinois General Assembly, and guardianship has to be ruled out before adoption, excuse me, pardon me, adoption has to be ruled out before guardianship can be put into place. The only real option here is, and I suppose the counsel didn't even argue this, but is it going to be guardianship? I mean, it has to be ruled out, and they're not eligible for it. I mean, this wasn't brief, but as long as these issues were coming up. The foster parents are not eligible for subsidized guardianship. They can do guardianship, but the children cannot get services and they cannot get a medical card, and that's due to DCFS regulations and Illinois law. Under the law, only relative children can get subsidized guardianship, meaning services and medical card. Only relatives. And there's another program where a child over the age of 14 who is not a relative can get that. Okay, so subsidized guardianship where the children get services and they need services, Victor needs services, and they need medical insurance, that is not possible under Illinois law. And in addition to that, adoption has to be ruled out. I go back to the fact, as this court has pointed out, four years. And this court, as well as the appellate court and the Illinois Supreme Court, has said over and over again, once unfitness is found, all factors yield to the best interests of the children. This is a great foster home. The children are strongly bonded to their foster parents. They're also bonded to their father and to some extent their mother. These are foster parents who realize that and will maintain that bond. When you said adoption must be ruled out, what were you saying? Ruled out as far as the foster parents are concerned? Correct. I'm saying what the Illinois legislature said. Just tell me. Section 2-28 of the Juvenile Court Act, adoption and return home have to be ruled out as both. Has to be ruled out and closed. I'm sorry? I didn't hear what you said. It has to be ruled out as both. As both, I'm sorry. As both. Yes. Before guardianship, subsidized guardianship, can be implemented. Correct. I would say Tijana O., Your Honor. Tijana O. Would you like to cite? Yes. Sure. That's a case I handled. Which explains it. It's a first district case, Your Honor. So Tijana O. is 2014, 1-33-119. That is the site. And there's other cases. Talking about guardianship has to be ruled out. In reject reacts, the second district case. And that's another case. That's not an issue. I apologize if I brought up an issue that wasn't briefed. I'm getting the best interest here. And return home, I don't see how that's realistic. So I'm trying to fill in the gaps here of what the father is even asking for. I mean, I was just saying, in the event that this court considers the possibility that guardianship might be a better option, I'm pointing, I'm making these arguments. I'm utilizing oral arguments for that purpose, to expand a bit on what was briefed. I think I'm coming to the end of my time. I would like to give a brief summation of my case. And then if the court has no more direct questions, I would thank the court for its time. If I can give a brief summation in the absence of any more questions, direct questions from the court, I would love to answer questions all day. All right. Is your answer to whatever unfairness the decision? I can't hear you. Is it your answer to the unfairness of this that it complies with the Illinois cases that you cited? I mean, there is a sense of unfairness here. Is that correct? I believe there's a sense of sympathy. I do not see a sense of unfairness, Your Honor. I'm sorry, I can't agree with that. I represent two children who have been in foster care for four years. And fairness is about achieving permanency for them. And I must respectfully say that fairness happened in this case. Four years at the time of the hearing. We're now at the fifth year. Correct, Your Honor. Correct. So, no, there is no unfairness. What I'm saying is we all have sympathy and compassion for any party with a mental illness. And what I'm saying is that under the case law, as I cited extensively in my brief and in my argument, in Ray HS, SKB, SS, those cases are on point and should guide this court. When one parent remains with a parent who is unsafe, and in this case, this court granted the Mother's Anders motion, when one parent remains with that other parent with the intention of co-parenting, the unsafe parent, that parent is unfit, under ground A, and under ground B in concern. It's precedent. As I said, if this court wants to reverse this case, I can't see how it cannot overrule those three cases. And if it does so, I don't think it's an exaggeration to say that a certain amount of chaos will result from that, unless this court devises a brand new rule of law to explain. Because I don't see how this case can be distinguished from the three cases that I've cited. And those three cases have guided both the finding of abuse and the decision on best interest. Well, actually, again, I cited those three cases mainly for the unfitness portion of the argument. There is a best interest analysis in those cases. But really, in the larger picture, I want to put the best interest analysis in the larger context. There's the whole line of cases that I studied in my brief saying, well, even if children have a bond with their parents, that doesn't stop, that shouldn't stop the child court from terminating parental rights. Also, this court and the appellate court in general have noted cases where foster parents are willing to maintain a bond, or willing to maintain contact between biological parents and the children, and have noted that approvingly. They're willing, but not required. They're not required. And the children deserve to have stability and permanency, and guardianship is an unstable outcome. And that's the only possible option here. Return home? You know, Brian, the father testifying at best interests. So, these children deserve permanency. The overwhelming weight of Illinois case law supports the trial court's decision. The trial court, I don't think it's an exaggeration to say, somewhat agonized over this decision. It was, the trial judge presided for four years and knew these people, knew the parents, knew the case worker, knew the children, and said, I, the trial court was not happy about it, but said, I have to do what I have to do and follow Illinois law, and I have to achieve permanency for these children. And the trial court explicitly relied on In Re HS, which they call identical, probably more accurate to call it extremely similar to this case. So, the trial court followed the law, followed the law of this court, and most importantly, it followed the law of the Illinois General Assembly, as interpreted by the clear statutory language of Ground M, which is any nine-month period following adjudication. I'm sorry, I have to repeat that the state and the trial court showed compassion and waited. They waited. They gave them a chance. And it got to the point where the mom started attacking police officers and got put in jail, and the state said, enough, we have to file. She attacked the DCFS supervisor, too. She did that to you. It might be a private security guard at the Walmart. I'm not sure. So, the unfitness is clear, I would argue. It's not determinative that the mother never directly harms her children. She showed physical aggression towards a number of people, in some instances in front of her children, which caused emotional harm to her children. And I want to make that point very strong, just here. The mother did not physically harm her children. She harmed them emotionally. There is no doubt that a three-year-old watching his mother attack a car, screaming, going into shock, that is harm. That is emotional harm. It's not physical harm. So, the mother is, unfortunately, dangerous to the children. The father never understood it. What is wrong with these people? He said, we didn't do anything wrong, ever. And after four years, today as we stand here, almost five, the law and fairness require permanency and stability for these children. And they will continue to have a relationship with their biological parents, as long as it's appropriate, as many other children have, and many other cases that have been affirmed by this Court. I thank the Court for its time. I thank the Court for its just-in-time. I thank the opposing counsel. Thank you. May it please the Court, Assistant State's Attorney Gina DeVito, for the record, we do concur with the public guardian's argument. And unless you have any questions for me, I will sit down. Thank you. Tell me, Gina DeVito. Yes, for the State's Attorney's Office. Thank you. Thank you. Five minutes to vote. Your Honors, this case is about whether or not the real goal of the Juvenile Court Act is to reunify families. Counsel for the minors indicates that... I'm sorry. The real purpose of today's case is to determine whether or not the law is what the Juvenile Act says it is, and that's to reunify families. Counsel for the guardian has indicated that the Court and the agency did want to terminate rights and prolong the case, hoping that the mother would get involved, and encouraging the father to encourage the mother to get the services she needed. But lo and behold, she did. Yes, it wasn't on the nine-month schedule that the law provides. But the Court went outside that nine-month period and wanted more time so the mother could get well. This is not an illness. This is not drug use, like some of the cases cited by the guardian ad litem, where you terminate rights where a parent stays with the drug user or a sexual abuser. This is a mental illness case. Mother didn't choose to be mentally ill. The father didn't choose to be mentally ill. The case shows that dad did what the agency asked him to do. He encouraged mother to get the treatment. It also showed that he stepped in when they did have joint visits and mother started to get agitated, and he did calm her down. He did intervene. Okay. So he was a positive influence with the mother, and therefore a good parent. The case law that indicates that a parent stays with a parent who doesn't make progress, those cases are cases where the parent didn't integrate what he or she had learned in her services. The parent coach indicates that is not the case for Brian. He did integrate what he learned in his ability to parent. Ms. Ulmer's mother's therapist said father was brought in by her to be a support to the mother, not because that they had a relationship in which they lived together. She said the mother and she had asked the father. Yes. All right. Well, who involved the mother? Not because they lived together, but because he was a support. We have conceded throughout this entire page. He has maintained a concerned relationship, a supportive relationship with the mother of his children, which is what we should want in any relationship involving children. The case law also allows the court to terminate one parent's rights and not terminate the other parent's rights. In this case, the law should be applied, even though mother's counsel determined there wasn't grounds for an appeal, and this court agreed to mother. In this case, father has, and the law also indicates at the best interest hearing, the court may, and I would say should, but that's the period from adjudication all the way to the time of termination. And if we look at that time period, mother has achieved what the court and the agency for all this case for. She's in full remission for 11 months. She's taking her medication. There's a CCJC evaluation that says she's not a parent. Okay? So if she is involved in those children's lives, she is not a danger to those children. There's never been any indication that Brian A. was a danger to his children. And yes, Brian A. is delusional. And there is no evidence that that delusional behavior affects his ability to parent, or that the children are in danger. And the law requires that you cannot terminate just because the parent is mentally ill. You have to show that that mental illness causes a danger to the children. There is no evidence in this case that Brian's delusional behavior or thoughts are a danger to these children. In fact, there's evidence that disputes that he's a good parent. His parenting coach has been thinking he's a good parent. This is a case that is distinguishable from F.A. In that case, mother never got involved. She never complied with services, and I know that because I was the attorney for the father in that case. So those cases are distinguishable. You don't have to overrule them. They are distinguishable. This is the one case where this court can take a position that the law wants to reunify families. We've torn enough families apart in juvenile court. This is one we can successfully reunify, and that's what the basis of this case should be for this court. Thank you. This letter will be taken under advisement. Court is adjourned.